IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

**WEST NORTH AVENUE 1600, LLC**
10 E. North Avenue, Suite 5
Baltimore, Maryland 21202

    *Plaintiff*

  v.

**FRANKENMUTH INSURANCE COMPANY**
**f/t/a FRANKENMUTH MUTUAL INSURANCE**
**COMPANY**
1 Mutual Avenue
Frankenmuth, MI 48787

    *Defendant*.

Case No. _____

## COMPLAINT

Plaintiff West North Avenue 1600, LLC ("Owner") asserts claims against Defendant Frankenmuth Insurance Company, formerly trading as Frankenmuth Mutual Insurance Company ("Surety"), in connection with Surety's failure to perform its obligations under a performance bond it issued to general contractor Modern Builders, LLC ("Contractor"), following Contractor's default on a contract to build an affordable housing construction project in Baltimore.  In support of Owner's claims, it alleges, upon knowledge as to itself and upon information and belief as to all other matters, the following:

### THE PARTIES

1. Owner is a Maryland limited liability company based in Baltimore, Maryland. Owner is an affiliate of a family-owned affordable housing developer that targets struggling and overlooked urban neighborhoods for community revitalization projects.  Owner's mission is to promote equitable development, preserve local heritage, and empower communities by providing

affordable housing to low-income populations. Owner's broader mission is to dismantle the legacy of racist housing policies in Baltimore, broadly identified as redlining. Owner's business model is to partner with housing-focused non-profit organizations to restore vacant buildings to productive use for low-income residents.

2. Surety is the insurance company that issued the performance bond to Modern Builders LLC, the general contractor on the project being constructed by Owner.

## VENUE AND JURISDICTION

3. The Court has subject matter jurisdiction over Owner's claims under 28 U.S.C. § 1332 because Owner and Surety are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. Owner is a limited liability company and its citizenship is determined by the citizenship of its members. Owner's members are citizens of Maryland, Texas, and Maine. Surety is a corporation incorporated in Michigan with its principal place of business is in Frankenmuth, Michigan.

4. The Court has personal jurisdiction over Defendant Surety because, at all relevant times, Surety purposefully availed itself of the privilege of doing business in the State of Maryland by issuing a performance bond to Contractor in relation to a construction contract to build an affordable housing project located in Baltimore, Maryland. The bond provided that any proceedings pursuant to it may be instituted in any court of competent jurisdiction in the location in which work is located.

5. Venue is proper in the Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Owner's claims occurred in this judicial district.

## FACTUAL BACKGROUND

### *The Project & Relevant Contracts*

6. Owner is the developer and owner of a community revitalization project in West Baltimore, known as the North Avenue Zero Energy Housing project (the "Project").

7. Contractor was the general contractor for the Project pursuant to a Construction Contract entered into between Contractor and Owner dated October 15, 2021 ("Construction Contract"). **Exhibit 1**.

8. Surety issued a performance bond to Contractor for the Project (Bond No. SUR0004411) in the amount of $3,500,000 ("Bond"). **Exhibit 2**. The Bond is a tripartite agreement involving Surety, Contractor as principal, and Owner as obligee. Under the Bond, Surety owes performance duties to Owner following any default termination of Contractor by Owner.

9. The payment structure as between the various parties on the Project was unique. At the start of construction on the Project, Owner was directed to issue payment to Surety, rather than Contractor, and Surety then planned to issue payments downstream to Contractor's subcontractors and suppliers. Consequently, unlike in most projects where a surety issues a bond and then has no active role unless a claim is filed, Surety here was involved in the Project finances throughout the relevant lifetime of the Project.

10. When completed, the Project will replace several vacant and decaying row homes with two mixed-use buildings, comprising ground-level commercial spaces and 20 residential

units (ten reserved for low-income residents).  Figure 1 below is a rendering of the completed Project.  Figure 2 below depicts the condition of the Project when construction started.

 

**Figure 1**: Rendering of completed Project      **Figure 2**: Conditions at start of construction

11. Aside from offering high-quality affordable housing where abandoned homes previously stood, the Project has reserved four commercial spaces for local businesses and West Baltimore nonprofits and incentivized a "live-where-you-work" concept, offering commercial tenants a first-right-of-refusal on the 20 residential units.

12. The ambitious Project is designed to be the first zero-energy mixed use/multifamily project in Baltimore.  A zero-energy building produces enough renewable energy to meet its energy consumption needs, therefore significantly reducing or eliminating energy bills for tenants.

13. Underscoring the Project's vital role in revitalizing West Baltimore's Penn North neighborhood, the Project received four grants from State and City funding sources, as well as widespread public support from community leaders and residents.  See Zero Energy North Avenue Affordable Housing Project, The Baltimore Sun (Nov. 15, 2021), available at https://www.baltimoresun.com/maryland/bal-md-zero-energy-north-avenue-affordable-housing-

project-vg-20211115-pjk72u7a6nh5pjt6tzup5goyku-photogallery.html.  It was also featured on PBS NewsHour as one of the most impactful projects in the country funded by the federal Opportunity Zone program.

### *Contractor Breaches the Construction Contract*

14. Contractor has defaulted on its contractual obligations on the Project, thereby undercutting Owner's promises to the West Baltimore community, damaging its financial stability and ability to borrow funds for other projects, and jeopardizing the Project's completion. Contractor's persistent shortcomings included (1) widespread and sometimes dangerous installation defects, including routinely performing work without consulting the Project plans and specifications and failing to submit necessary RFIs; (2) acknowledged failure to meet the Project schedule, including the Project completion deadline; and (3) failure to supervise the work with a full-time and qualified superintendent. The full extent of Contractor's deficient work is detailed in a 16-page report by the Project's architect, which tells a troubling story of a construction project in shambles.

15. On August 8, 2022, Owner issued to Contractor a default notice pursuant to Article 14.2 of the Construction Contract's General Conditions. Among other issues, the default notice identified Contractor's (1) deficient work, (2) failure to prosecute its work in accordance with the Project schedule, and (3) failure to employ a competent superintendent on the Project and otherwise supervise the work. The notice cited a 14-day cure period. Surety was copied on this correspondence. At the time of Owner's default notice – approximately ten months after Contractor's initial mobilization – Contractor had completed only a small fraction of its scope of work.

16. On September 13, 2022, Owner notified the Surety that Contractor had failed to cure the deficiencies and provide reasonable assurances of its ability to complete the Project.

17. By September 21, 2022 – well beyond Contractor's 14-day cure period – Contractor had all but ignored Owner's default notice; Contractor was rarely on site during the cure period, and the few times it was on site, it continued to materially breach the Construction Contract in the same ways that Owner had identified in the notice.

18. On October 17, 2022 – more than two months after Owner's initial default notice – Contractor still had not taken steps to cure its breaches. The Project remained woefully behind schedule, and Contractor's deficient work (and related property damage) remained mostly uncorrected. Owner had no choice but to terminate the Construction Contract to attempt to save the Project.

19. In a transparent attempt to divert attention from its deficient and incomplete work, Contractor has claimed that Owner's termination was wrongful, and that Owner breached the Construction Contract first because it did not certify progress payments that Contractor submitted shortly before Owner terminated the Construction Contract. Owner's decision to withhold progress payments based on Contractor's many material breaches was justified.

### *Surety Breaches the Bond*

20. Section 3 of the Bond provides that Surety's obligations shall arise after "[3.2] the Owner declares a Contractor Default, terminates the Construction Contract and notifies the Surety; and [3.3] the Owner has agreed to pay the Balance of the Contract Price in accordance with the terms of the Construction Contract to the Surety or to a contractor selected to perform the Construction Contract.

21. In accordance with these provisions, on or about October 20, 2022, Owner provided formal notice to the Surety that Contractor had defaulted, and that the Construction Contract had been terminated. In that communication, Owner agreed to pay the balance of the Contract Sum (as defined in the Construction Contract) to Surety or to a contractor selected by Surety to perform the work described in the Construction Contract. This triggered Surety's obligations under the Bond.

22. Section 5 of the Bond provides that, when the Owner has satisfied the conditions of Section 3, Surety shall *promptly* take one of the following actions:

> § 5.1  Arrange for the Contractor, with the consent of Owner, to perform and complete the Construction Contract;
>
> § 5.2 Undertake to perform and complete the Construction Contract itself, through its agents or independent contractors;
>
> § 5.3 Obtain bids or negotiated proposals from qualified contractors acceptable to the Owner for a contract for performance and completion of the Construction Contract, arrange for a contract to be prepared for execution by the Owner and a contractor selected with the Owner's concurrence, . . . and pay to the Owner [an amount in accordance with Section 7]; or
>
> § 5.4 Waive its right to perform and complete, arrange for completion, or obtain a new contractor and with reasonable promptness under the circumstances
>
>> .1  After investigation, determine the amount for which it may be liable to the Owner and, as soon as practicable after the amount is determined, make payment to the Owner; or
>>
>> .2  Deny liability in whole or in part and notify the Owner, citing the reasons for denial.

Ex. 2.

23. Section 6 of the Bond provides that, "[i]f the Surety does not proceed as provided in Section 5 with reasonable promptness, the Surety shall be deemed to be in default on this Bond ... , and the Owner shall be entitled to enforce any remedy available to the Owner."

7

24. Following termination of the Construction Contract in October 2022, Owner engaged in discussions with the Surety regarding Surety's obligations to perform under the Bond. In particular, Owner inquired whether Surety had undertaken an investigation into Contractor's defective work or conducted an evaluation of its options under Section 5 of the Bond.

25. Surety indicated a desire to utilize Contractor to complete the Project pursuant to Section 5.1. Owner refused to consent, as is its right under the Bond, because of Contractor's numerous material breaches and poor workmanship.

26. On December 9, 2022, Owner sent a letter to Surety reiterating its objection to Surety using Contractor to complete the Project, and inquired whether Surety had made a determination of how it intended to complete the Project, other than through the former Contractor. Owner urged that a reasonable time for Surety to select a method of performance had already expired, and that further delay would result in Owner declaring Surety in default.

27. On January 12, 2023, Surety sent a letter to Owner refusing to perform its obligations under the Bond. Surety's stated basis for denying the claim was that Owner had wrongfully withheld payment from Contractor and had terminated the Construction Contract without cause.

28. Surety never visited the worksite to investigate the status of the work prior to denying the claim.

### *Owner's Justified Decision to Withhold Certain Payments*

29. Owner's decision to withhold payments based on the Contractor's many material breaches was fully justified.

Case 1:24-cv-01310-JRR   Document 1   Filed 05/03/24   Page 9 of 14

30. On August 3, 2022, Contractor submitted what it referred to as Pay Application No. 4 for $73,880.63. That application, though, did not contain lien releases and other supporting documentation required under Section 9.3 of the Contract's General Conditions. Contractor did not submit these required documents – and thus submit a completed pay application under the Contract – until late September 2022, more than a month after Owner sent its initial default letter to Contractor and after Contractor's cure period had expired.

31. On October 14, 2022, Contractor submitted to Owner purported Pay Application No. 5 for $193,741.06, which was incomplete and falsely claimed that Contractor had performed work that, in fact, it had not performed. For example, Contractor claimed the framing work was 80% complete when in reality, the actual percentage complete was much lower and much of the work was performed incorrectly. Contractor did not submit – and has never submitted – Pay Application No. 5 with lien releases and supporting documents that are a precondition to payment under the Contract. In fact, so-called Pay Application No. 5 is not even notarized, as the Contract requires.

32. Surety is also mistaken with respect to the allegation that payment was wrongfully withheld because Contractor has repaired the alleged defective items. Owner provided Contractor and Surety with a long list of defective Work that predated the final cure period and Owner's subsequent termination of Contractor. During that final cure period, Contractor was rarely on-site and seldom properly supervised, as required by the Construction Contract. Any claim that defects were corrected is plainly refuted by the results of the architect's inspection of the work at the Project subsequent to the termination.

33. Surety is also incorrect that the superintendent issue was rectified by Contractor. Under Section 3.9.1 of Construction Contract, Contractor was obligated to "employ a competent superintendent and necessary assistants who shall be in attendance at the Project site during

9

performance of the Work." Ex. 1, A201 at 14. Contractor failed to do so. Beginning with Owner's initial default notice on August 8, 2022, and continuing with each subsequent default notice, Owner notified Contractor that there was consistently no superintendent on-site while work was being performed and this failure constituted a default under the Construction Contract.  On September 23, 2022, Owner received Contractor's first submission of documents to purportedly justify their superintendent choice.  The documents submitted were resumes for two individuals, one of whom was not even an employee of Contractor as of the date of submission, and did not list any relevant project experience.  The resumes only included general detail about prior experience, not listing any specific relevant project experience, references, or other detail necessary to assess their qualifications relevant to the Work.

34. Further, under Section 3.9.2 of the Construction Contract (A201), Owner is afforded fourteen (14) days to notify the Contractor stating whether Owner (1) has reasonable objection to the proposed superintendent or (2) requires additional time for review.  Ex. 1, A201 at 14.  On September 24, 2022, the day after receiving Contractor's incomplete submission of superintendent qualifications, Owner notified Contractor that it had failed to furnish the necessary qualifications for their proposed superintendent and requested the information necessary for Owner to be able to make its determination.  Contractor, however, never supplemented its submission with the requisite materials.

35. Finally, Surety is wrong with respect to the allegation that Contractor had notified Owner of delays in the Project timeline, but Owner refused to approve the revised schedule. Under Sections 3.1 and 3.3.1 of Construction Contract, Contractor was obligated to achieve Substantial Completion within 365 days from the date of the notice to proceed issued by Owner. Owner issued the notice to proceed on October 22, 2021.  Ex. 1, A201 at 12. Under Section 3.10.1, promptly after being awarded the Contract, Contractor was obligated "to submit, for the Owner's

information, a construction schedule for the work[.]" Id. at 14-15.  Contractor was then obligated to "update the schedule at appropriate intervals as required by the conditions of the Work and Project." Id. at 15.

36. At no time during the course of the Project did Contractor seek an extension of time in accordance with provisions of the Construction Contract.  Instead, on July 13, 2022, Contractor submitted an updated schedule to Owner showing Substantial Completion of the Project in February 2023.  On or about August 8, 2022, Owner sent its first letter notifying Contractor that it was in default under the Contract for, among other things, notifying the Owner that the Project would be completed after the date established for Substantial Completion in the parties' Contract.  Thereafter, on September 21, 2022, Contractor submitted another schedule to Owner showing that they were not going to achieve Substantial Completion until April 2023, approximately six months after the Substantial Completion date.  Contractor's mere submission of these revised schedules does not constitute an appropriate claim or request for an extension of Contract Time under the terms of the Construction Contract. Owner had no obligation to approve a proposed schedule that showed the work being completed approximately six months after the substantial completion deadline.

37. Standing alone, Contractor's numerous material and uncured breaches – described in detail above – deprived it of any right to payment.

38. Section 9 of the Construction Contract's General Conditions further undercuts any right to payment for the two pending payment requests.  Relevant here, Section 9.5 provides that Owner may withhold payments "to such extent as may be necessary in the Owner's commercially reasonable opinion to protect the Owner from material loss for which the Contractor is solely responsible," including loss due to:

    a. defective Work not remedied;

    b. actual material damage to the Owner;

    c.   reasonable written evidence that the Work will not be completed within the Contract Time, and that the unpaid balance would not be adequate to cover actual or liquidated damages for the unanticipated delay; or

    d.   repeated failure to carry out the Work in accordance with the Contract Documents.

Ex. 1, A201 at 25.

39. By the time Contractor submitted its two payment requests in Fall 2022, the cost to correct Contractor's Project-wide deficient work dwarfed the amount that Contractor sought.

40. Contractor's dereliction of its responsibilities has jeopardized the Project, and substantially increased Owner's costs.

### *The Arbitration*

41. On November 3, 2023, pursuant to the terms of the Construction Contract, Owner initiated an arbitration against Contractor under the auspices of the American Arbitration Association (AAA Case No. 01-23-0005-0107) (the "Arbitration"), seeking reimbursement for damages it has incurred, and will continue to incur in the future, arising out of Contractor's egregious and material contractual breaches. Owner estimates that those damages will exceed $2.8 million. The Arbitration is still pending.

42. Owner invited Surety to participate in the arbitration, but Surety refused.

43. All disputed issues regarding breach of the Construction Contract will be adjudicated in the Arbitration. The Arbitrator's finding on material breach will necessarily determine not only the rights and obligations Owner and Contractor under the Construction Contract, but also the rights and obligations of Surety and Owner under the Bond. Surety's reasons for refusing to perform under the Bond echo the arguments Contractor has made. All surety-specific defenses can and should be raised and addressed as part of the arbitration, so there is no reason for Surety to refuse to participate, other than to make adjudication of the

dispute more expensive and time consuming for Owner. Pursuant to well-settled law, the outcome of that Arbitration will be binding on Surety in this Court. All issues in this case will therefore be conclusively determined in the Arbitration.

## COUNT I
### (Breach of the Bond)

44. Owner re-alleges and incorporates the allegations contained in the previous paragraphs.

45. Surety issued the Bond to Contractor for work on the Project. Owner is an obligee under the Bond. Surety owes duties to Owner as obligee under the Bond. In the Bond, Surety guaranteed to the Owner performance of the Construction Contract in the event of Contractor's default.

46. Contractor materially breached the Construction Contract by, among other things, (1) failing to conform its work to the plans, specifications, and other Construction Contract requirements, (2) admittedly failing to meet the Project schedule, including the substantial completion deadline, and (3) failing to appoint a competent superintendent to supervise the work.

47. Surety's obligations under the Bond were triggered following Owner's compliance with the requirements set forth in Section 3 of the Bond.

48. Surety failed to take action with reasonable promptness as required by Section 5 of the Bond, and then wrongfully refused to perform under the Bond.

49. Surety's refusal to perform under the Bond and to proceed under Section 5 with reasonable promptness constitutes a default and breach of the Bond.

50. Surety violated its duty of good faith and fair dealing by failing to inspect the deficient work before denying Owner's bond claim.

51. Owner has suffered significant damages as a result of Surety's default and breach.

**WHEREFORE**, Owner respectfully requests that the Court (1) find that Surety wrongfully breached its obligations to Owner under the Bond by refusing to perform; (2) award damages to Owner in an amount exceeding $75,000, to be determined at the Arbitration; (3) award Owner pre-judgment and post-judgment interest based on the amount proven during the Arbitration, including costs and attorneys' fees incurred in the Arbitration; (4) award Owner costs, expenses, and reasonable attorneys' fees incurred in pursuing this matter; and (5) award any other relief that the Court deems just and proper.

Respectfully Submitted,

Dated:  May 3, 2024

*/s/ Paul S. Caiola*
Paul S. Caiola (Fed. Bar # 23940)
Sam Cowin (Fed. Bar # 21126)
Sarah R. Simmons (Fed. Bar # 24279)
GALLAGHER EVELIUS & JONES LLP
218 N. Charles Street, Suite 400
Baltimore, MD 21201
Telephone: (410) 727-7702
Facsimile: (410) 468-2786
pcaiola@gejlaw.com
scowin@gejlaw.com
ssimmons@gejlaw.com

*Attorneys for Plaintiff West North Avenue 1600, LLC*